UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Criminal No. 18-CR-350 (TSC) |
| v. | |
| **FANOR HERNAN BARONA RAMIREZ,** | <u>**UNDER SEAL**</u> |
| Defendant. | |

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

The United States of America (hereinafter "the government"), by and through the undersigned attorneys, respectfully submits this Memorandum in advance of the sentencing of the defendant, Fanor Hernan Barona Ramirez (hereinafter "the Defendant"), which is currently scheduled for May 14, 2024, at 10:00 a.m. For the reasons set forth below, the government respectfully requests a sentence of 135 months' incarceration. Such a sentence would be sufficient to account for the factors set forth at 18 U.S.C. § 3553(a).

**I.   FACTUAL BACKGROUND**

From around February 2018 continuing up to and including November 2018, the Defendant was part of a conspiracy, which operated in the countries of Colombia, Costa Rica, Mexico, and the United States. *See* Statement of Facts, ECF No. 74 ¶ 2. The object of the conspiracy was to purchase wholesale quantities of cocaine from sources of supply in Colombia and to transport that cocaine to Central America and Mexico, for further importation into the United States. ECF No. 74 ¶ 3. During the conspiracy, the Defendant facilitated the purchase and transportation of that cocaine for a Drug Trafficking Organization ("DTO"). *Id*. The DTO used a variety of means to transport its cocaine, including small aircraft and go-fast boats. *Id.*

In and around February 2018, the Defendant and his co-conspirators attended a meeting

with a cocaine supplier in Medellin, Colombia and discussed the purchase of 200 kilograms of cocaine for transport and sale to the leader of a Mexico-based DTO who went by the alias "El Tio." ECF No. 74 ¶ 4. The co-conspirators agreed to invest in half of a 400-kilogram shipment. *Id.* The Defendant and his co-conspirators discussed various details of the potential deal, to include price per kilogram of cocaine, transportation fees, installment plan payments, the use of aircraft for transportation, and the prospective buyer's intention to ultimately transport the shipment into the United States, specifically Los Angeles. ECF No. 74 ¶¶ 5–6.

In and around February 2018, the Defendant and his co-conspirators attended a meeting with a cocaine supplier in Cali, Colombia, to discuss future cocaine shipments from Colombia, Venezuela, Mexico, and Costa Rica. ECF No. 74 ¶ 7. At the meeting, the Defendant and his co-conspirators discussed various details, to include prospective customers in Costa Rica seeking supplies of cocaine, the use of a private aircraft and clandestine airstrips for delivery of the shipment to Costa Rica, the use of fishing vessels for maritime shipping from Costa Rica to Mexico, the use of GPS devices to track the shipment, and, though they discussed prices, they were unable to reach a final price and agreed to engage in further negotiations. ECF No. 74 ¶¶ 8–9, 11.

In and around April 2018, two co-conspirators traveled to Costa Rica to prepare for the shipment of cocaine from Colombia to Costa Rica. ECF No. 74 ¶ 10. While in Costa Rica, the two-conspirators traveled to a remote mountainous area of the Punta Arenas province to evaluate a clandestine airstrip for suitability for landing their airplane load of cocaine. *Id.*

On or about May 18, 2018, the Defendant, on behalf of his co-conspirators, made an initial payment of one billion Colombian pesos for the purpose of purchasing at least 200 kilograms of cocaine. ECF No. 74 ¶ 12. The Defendant delivered the money to a Colombian National Police

("CNP") undercover officer ("UC") in the UC's room at the Hotel Capri in Cali, Colombia.[1] *Id.*; *see also* Image 1 below.



*Image 1 – Cash Delivery #1 at Hotel Capri in Cali, Colombia*

On or about July 7, 2018, the Defendant, on behalf of his co-conspirators, made the second payment of one billion Colombian pesos to a CNP UC at Hotel Pasoancho in Cali, Colombia. ECF No. 74 ¶ 13; *see also* Image 2 below.

---

[1] The photographs in the government's sentencing memo are still shots from videos previously provided to defense counsel in discovery.

3



*Image 2 – Cash Delivery #2 at Hotel Pasoancho in Cali, Colombia.*

On or about July 8, 2018, the Defendant and his co-conspirators met with their cocaine supplier in Armenia, Colombia, and explained to the supplier that payment of their final installment had been delayed due to difficulty moving money from Mexico to Colombia. ECF No. 74. ¶ 14. At this meeting, the Defendant and his co-conspirators examined a photograph of a clandestine airstrip in Costa Rica that was being considered as a transshipment point; they requested specific markings or stamps for the individual kilograms of cocaine; they requested to conduct a visual inspection of the cocaine prior to departure from Colombia; and they discussed the possibility of conducting future cocaine shipments of larger quantities if the planned delivery was successful. ECF No. 74 ¶¶ 15–16.

On or about July 23, 2018, the Defendant and his co-conspirators made their third and final payment of 600 million Colombian pesos for the purpose of purchasing the initial 200 kilograms of cocaine. ECF No. 74 ¶ 17. The Defendant delivered the money to the CNP UC's room at Hotel Capri in Cali, Colombia. *Id.*; *see also* Images 3 and 4 below.

     

*Image 3 –Cash on the Bed*            *Image 4 – The Defendant*
*Cash Delivery #3: at Hotel Capri in Cali, Colombia.*

From August 2018 until September 2018, the Defendant had multiple meetings with the cocaine supplier in Monteria, Colombia to discuss the logistics of the cocaine transport from Monteria, Colombia to Costa Rica. ECF No. 74 ¶ 18.

In September 2018, a co-conspirator informed the Defendant, that the cocaine shipment was loaded and ready. ECF No. 74 ¶ 19. The Defendant responded, advising the co-conspirator that the airplane was cleared for take-off without visual inspection of the shipment. *Id*. After receiving a report that the aircraft had departed, the Defendant requested continuing updates on the status of the plane. *Id*. On September 14, 2018, a plane departed from Los Garzones International Airport in Monteria, Colombia, transporting the cocaine the DTO had purchased. ECF No. 74 ¶ 20. The plane was subsequently seized and approximately 191 kilograms of cocaine—bearing the stamp and sticker the conspirators had requested—were recovered from the plane. *Id.*

5

## II. PROCEDURAL HISTORY

On November 29, 2018, a federal grand jury returned a one-count Indictment charging the Defendant with conspiracy to distribute five kilograms or more of cocaine, a Schedule II controlled substance, intending, knowing, or having reasonable cause to believe that the controlled substance would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960, and 963, and 18 U.S.C. § 2.  ECF No. 1.

The Defendant was arrested in Colombia on October 9, 2019, and extradited to the United States on April 23, 2021.  On January 23, 2024, the Defendant pleaded guilty—pursuant to a plea agreement—to Count One of the Indictment.  Min. Order Jan. 23, 2024; s*ee also* Defendant's Plea Agreement, ECF No. 73.

## III. STATUTORY PENALTIES

As noted by the plea agreement, the Defendant faces a maximum sentence of life imprisonment, a mandatory minimum sentence of ten (10) years imprisonment, a fine of up to $10,000,000, and a term of supervised release of at least five (5) years.  ECF No. 73 at 1.

## IV. THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

The Sentencing Guidelines are advisory, not mandatory.  *United States v. Booker*, 543 U.S. 220, 258-60 (2005).  However, the Supreme Court held in *Booker* that sentencing courts must consider the Guidelines in formulating an appropriate sentence.  *Id.*  In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of *Booker*:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

552 U.S. at 49 (citation omitted).

The government agrees with the Guidelines analysis as calculated by the U.S. Probation Office in the Presentence Investigation Report ("PSR"). PSR ¶¶ 41–58. As of the date of this filing, the Defendant did not have any objections to the Probation Office's Guidelines calculation. The U.S. Probation Office calculated the Base Offense Level at 36, based on an offense involving between 150 and 450 kilograms of cocaine under the Sections 2D1.1(a)(5) and (c)(2) of the Guidelines. PSR ¶ 48. Because of the Defendant's use of an aircraft other than a regularly scheduled commercial air carrier to unlawfully export cocaine, the Probation Office applied a two-level increase under Section 2D1.1(b)(3) of the Guidelines. PSR ¶ 49. The Defendant meets the criteria set forth in Section 4C1.1, "zero-point offender" provision, and the Probation Office applied a two-level reduction in offense level. PSR ¶ 57. The Probation Office determined that the Defendant meets the criteria for relief under Section 5C1.2, the safety valve provision, and applied a two-level decrease in the offense level pursuant to Section 2D1.1(b)(18). PSR ¶ 50. The Defendant accepted responsibility for the offenses and timely notified the government of his intention to enter a guilty plea, and a three-level reduction was applied, pursuant to U.S.S.G. §§ 3E1.1(a) and 3E1.1(b). PSR ¶ 55-56. Thus, the total offense level is 31. PSR ¶ 58.

The Probation Officer correctly identified that the Defendant's criminal history score is zero and the resulting criminal history category is I. PSR ¶ 61. Based on a total offense level of 31 and a criminal history category of I, the resulting Guidelines range is 108 to 135 months' imprisonment. PSR ¶ 97. For the reasons set forth below, the government recommends a sentence of 135 months imprisonment, a sentence at the high end of the resulting Guidelines range.

V.   **SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)**

After calculating the advisory Guidelines range, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing,

[a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 49–50 (citation and footnote omitted).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at

50.

### A. Nature and Circumstances of the Offense

The Defendant's conviction arises out of his participation in a drug trafficking organization that on at least one occasion arranged for the transportation of a large quantity of cocaine from Colombia to Costa Rica for ultimate importation into the United States. The nature and circumstances of his crime weigh heavily towards a significant term of incarceration.

The Defendant committed a serious crime against the United States, having admitted to conspiring to distribute between 150 and 450 kilograms of cocaine to the United States. Without hesitation or reluctance, he worked with co-conspirators to coordinate at least one large-scale cocaine transactions between Colombian sources of supply and a Mexican DTO. Additionally, the conspiracy involved detailed coordination and sophisticated logistical planning, to include the recruitment of a trained pilot, the acquisition and use of private aircraft, the identification, reconnaissance, and use of a clandestine airstrip in Costa Rica, the use of maritime shipping for further distribution from Costa Rica to Mexico, and use of GPS devices to track and protect the shipment. Furthermore, the Defendant admitted to knowing that the cocaine was destined for the United States and was aware that co-conspirators intended to transport the cocaine to Los Angeles, California.

The quantity of cocaine further establishes the seriousness of the offense. This offense involved approximately 400 kilograms of cocaine, which is an extremely dangerous and destructive illegal street drug. The Defendant and his co-conspirators planned to ship 1,500 kilograms if the 400-kilogram shipment was successful. The costs that society incurs in dealing with the effects of these illegal narcotics are enormous, including the costs associated with law enforcement. Any sentence imposed must reflect the seriousness of this criminal conduct. The

government submits, based on the facts of the instant case and the Defendant's role in this cocaine distribution conspiracy, that a sentence of 135 months takes into consideration the nature and circumstances of the conspiracy and the type and quantity of drugs to be distributed. Such a sentence reflects the seriousness of the offense.

      **B.**      **The History and Characteristics of the Defendant**

The Defendant is a 58-year-old citizen of Colombia with a brief period of residence in the United States from 1997 to 2003. PSR ¶¶ 67, 69. As set forth in the PSR, he has one known arrest in New York in 1993, resulting in a conviction for bribery. PSR ¶ 60. The Defendant reports being a devout and practicing Christian. PSR ¶ 71. After completing high school, he served in the Colombian Armed Forces for two years. PSR ¶¶ 79, 88. The Defendant was legitimately employed for extended periods, working in real estate from 2004–2007, driving a taxi from 2016–2017, and managing an agricultural farm 2017–2019, the latter of which coincides with the charged conspiracy. PSR ¶¶ 79, 85–87.

Aside from his father's reported alcohol abuse and aspects of domestic violence in the home, the Defendant reports a generally stable upbringing with a "close family unit." PSR ¶¶ 67-68. The Defendant's older brother has been employed as an architect for the past 24 years, and his younger sister has been employed as a schoolteacher in the United States for the past 14 years. PSR ¶ 67.

Based on the personal history and family data derived from his presentence investigation interview, and the Defendant's otherwise legitimate employment in real estate, taxi driving, and farm management, it stands to reason that he made the conscious choice to engage in drug trafficking out of greed. As evidenced by his criminal conduct in the instant matter, the Defendant clearly profited from his participation in narcotics trafficking ventures. Imposing a significant

sentence—135 months imprisonment—will send a clear message that the cost of criminal conduct is far greater than the value of any illicit proceeds.

      **C.**      **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

Congress has gone to great lengths to send the message to drug traffickers that the United States will not tolerate the importation and trafficking of illicit drugs in the United States. This message was first codified in the Comprehensive Drug Abuse Prevention and Control Act of 1970. *See* 84 Stat. 1236. Title III of the 1970 Act—referred to as the Controlled Substances Import and Export Act of 1970—adopted strict regulatory requirements for importation and exportation of controlled substances. *See* 84 Stat. 1289, codified at 21 U.S.C. §§ 951-971. It also criminalized the manufacture and distribution of a controlled substance "intending" or "knowing" that the controlled substance would be unlawfully imported into the United States. Pub. L. No. 91-513, Title III, § 1009 (Oct. 27, 1970), codified at 21 U.S.C. § 959. Here, Congress sought to eradicate the international drug trade insofar as the illicit substances were bound for the United States.

The Defendant was part of a conspiracy that involved hundreds of kilograms of cocaine trafficked throughout South America and Central America. He conspired with others to help network Colombian sources of supply with Mexico-based buyers and helped coordinate a 400-kilogram shipment of cocaine from Colombia to Costa Rica for further transportation into Mexico and the United States. The method of distribution and object of the conspiracy falls squarely into a category of conduct that Congress prohibited. A sentence of 135 months reflects the seriousness of the offense and will promote respect for the law. A lesser sentence would suggest to the public, in general, and other drug traffickers, specifically, that attempts to distribute large quantities of controlled substances are not taken seriously. In this way, a lesser sentence could encourage further drug trafficking efforts. *See Gall,* 552 U.S. at 54 (2007) (it is a "legitimate concern that a

11

lenient sentence for a serious offense threatens to promote disrespect for the law").

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B–C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The international drug trade has many components—growers, producers, couriers, suppliers, brokers and dealers, to name a few. To profit from this illicit trade, drug traffickers must move the illicit drug—in this case cocaine—from the country in which it is produced to other parts of the world where demand is high.

Most of the cocaine distributed throughout the world is produced in Colombia. High-level traffickers go to great lengths to move cocaine out of Colombia to Central America, including Costa Rica, where there is greater access to open waterways and airspace conducive to moving large quantities of cocaine to other countries, including Mexico and the United States.

Given drug trafficking's adverse societal and community impacts, it is important that the Court impose a sentence that will deter others from engaging in this activity. A significant sentence in this case will send a clear message to other similarly situated players in the drug trafficking world that regardless of role, punishment is certain. While this prosecution disrupted some fraction of narcotics trafficking, continued drug trafficking plainly still occurs on a massive scale. The recommended sentence will deter other narcotics traffickers by demonstrating that such activities result in substantial periods of incarceration.

*Specific Deterrence*

The Defendant's actions demonstrate the need for specific deterrence and weigh heavily in favor of a lengthy term of incarceration. The Defendant joined a conspiracy whose sole purpose was to transport hundreds of kilograms of cocaine from Colombia to Costa Rica, with an ultimate destination of the United States. The Defendant willingly participated in multiple discussions regarding the transportation of at least 150 kilograms of cocaine from Colombia to the United States. He had knowledge of specific routes and methods of transportation out of Colombia and into Costa Rica, where the cocaine shipments would be transferred to boats for transportation into Mexico and then the United States. This suggests a familiarity with the transnational drug trade and tactics to avoid detection from law enforcement. The government acknowledges that the Defendant accepted responsibility by entering into a plea agreement, but his willingness to participate in a crime that involves narcotrafficking in large quantities of cocaine—and for personal gain—establishes a need to deter him from engaging in similar conduct in the future.

E.     **Unwarranted Sentencing Disparities**

Finally, as to 18 U.S.C. § 3553(a)(6)—"the need to avoid unwarranted sentencing disparities among defendants *with similar records* who have been found guilty of *similar conduct*"—the statute requires a specific evaluation of the compared defendants' records and conduct. When determining whether a sentence creates an unwarranted disparity, the Court should also consider, *inter alia*, a defendant's acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, a defendant's criminal history, and whether and to what extent a defendant cooperated. *See, e.g., United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences was "entirely explained" by co-defendant's acceptance of responsibility and thus any disparity resulting from defendant's

"harsher" sentence was not unwarranted). A defendant is only entitled to "a weighing of the section 3553(a) factors that are relevant to [his] case, not to a particular result." *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).

To date, none of the co-conspirators who worked with the Defendant have been sentenced. The government, however, has identified one defendant in another case whose conduct was sufficiently similar to the Defendant's and who provides parameters for the government's recommendation. Notably, the circumstances surrounding the other defendant's offense conduct are unique and may not provide precise comparators.

Benjamin Soto, Jr., 23-CR-44 (RJL)

Benjamin Soto, Jr. ("Soto"), an employee of a large-scale, U.S.-based commercial shipping company, conspired with others to receive hundreds of packages from drug couriers, containing varying amounts of controlled substances, including methamphetamine, cocaine, fentanyl, heroin, and Ritalin. Soto leveraged his position within the company, to facilitate the shipment of these controlled substance-laden packages to destinations throughout the United States. Soto and his co-conspirators were accountable for the importation and distribution of at least 33 kilograms of methamphetamine, 19 kilograms of cocaine, seven kilograms of fentanyl, and one kilogram of heroin.

Soto's sentencing range was 108-135 months' imprisonment. Two levels were added to the base offense level because the offense involved the importation of methamphetamine. Soto met the criteria for safety valve resulting in a two-point reduction, and an additional two-point reduction under the guidelines' amendments for "zero-point" offender. Soto also accepted responsibility, resulting in a 3-level reduction.

The government requested a sentence of 135 months. Soto was sentenced to 108 months,

the bottom of his applicable guidelines' range.

## VI. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 135 months, a sentence at the high end of the resulting Guidelines range as calculated by the Probation Officer, five years of supervised release, and the mandatory $100 special assessment.

Respectfully submitted,

MARLON COBAR
Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

By: /s/*Douglas Meisel*
Douglas Meisel
Imani Hutty
Josh Katcher
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division,
U.S. Department of Justice
145 N. Street NE, Washington, D.C. 20530
Telephone: (202) 598-2281

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the government's sentencing memorandum was served on counsel of record for the Defendant via the electronic mail.

          By:    /s/*Douglas Meisel*_____
                  Douglas Meisel
                  Trial Attorney
                  Narcotic and Dangerous Drug Section
                  U.S. Department of Justice